IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Anthony N. Briggs, | ) | |
| | ) | CIVIL ACTION NO. 9:13-1348-RMG-BM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| South Carolina Department of Corrections, | ) | |
| Thomas Cooper, Troy Lyde and | ) | |
| Willington Williams, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This case was originally filed in the Dorchester County Court of Common Pleas, and was subsequently removed to this Court by the Defendants on May 17, 2013. On June 27, 2013, Plaintiff filed an amended Complaint. See Court Docket Nos. 1, 15. Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges, inter alia, violations of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on December 5, 2013. As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on December 6, 2013, advising Plaintiff of the importance of a motion for summary judgment and of the need for him to file an adequate response. Plaintiff was specifically advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby ending his case.



Plaintiff thereafter filed a memorandum in opposition to the Defendants' motion for summary judgment on February 10, 2014, and Defendants' filed a reply memorandum on February 20, 2014. Defendants' motion is now before the Court for disposition.[1]

## Background and Evidence

Plaintiff alleges in his verified Amended Complaint[2] that he is an inmate at the Lieber Correctional Institution, part of the SCDC system. The Defendants Cooper, Lyde and Williams are all alleged to be correctional officers employed at Lieber. Plaintiff alleges that after he was transferred to Lieber, he was the victim of extortion and was beaten up when he refused to pay for protection. Plaintiff alleges that it took "officers" two days to find out that Plaintiff had been beaten because of "poor and inadequate security issues". Plaintiff also alleges that he was assigned to Cell 31 (B) of the Ashley Dorm, which had one bed and one toilet with no other amenities. Plaintiff alleges that for two and a half weeks he washed his face, brushed his teeth, and washed his clothes out of the toilet while prison officials failed to respond to his request forms.

Plaintiff alleges that he was thereafter moved to Cell 11 (B), and that this cell had no mirror, table or chair, and only one locker that he had to share with his cell mate. Plaintiff alleges he lived in that cell, which had no ventilation, heat or air, for one year. Plaintiff alleges that the windows were "zip tied" so that inmates could not open them. Plaintiff further generally alleges that

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this is a dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the *factual allegations* contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



lunch from the kitchen was "far from being sanitary", the serving trays were dirty, that sometimes there were bugs in the food, that most of the meals were undercooked, and that the floors and tables were not properly cleaned.

Plaintiff alleges that on January 18, 2012 there was a riot in which inmates from A Wing basically trashed B Wing. Plaintiff alleges that the and his cell mate (Christopher Driggers) stayed in their cell even though they were asked to come out, that the window in his cell was "busted", and the lock bent on their door. Plaintiff alleges that at approximately 4:00 a.m. the rapid response team came into his cell, where Plaintiff and his cell mate were "covered up" because of the cold water and tear gas being used by the rapid response team. Plaintiff alleges he was subjected to "excessive force" by the response team, including being cuffed with zip tie cuffs and sprayed in the face with mace. Plaintiff alleges he was also hit in the bend of his legs with a baton and told to get on the ground, where he lay on the "frozen wet ground" for around thirty minutes while other inmates were being brought out of the dorm. Plaintiff alleges that he and other inmates were then placed into a holding cell, and that his zip tie cuffs were too tight, resulting in a lack of circulation to his hands. Plaintiff alleges that about six hours later, his cuffs were taken off and new ones were put on. Plaintiff further alleges that the inmates were not allowed to use the bathroom for over nine hours.

Plaintiff alleges that at approximately 1 to 1:30 p.m., the inmates were moved to the "lock up" holding cells, where they were able to use the bathroom and take off the zip tie cuffs. Plaintiff alleges that he and the other inmates were left in the holding cell barefoot, wet and cold, and were not provided with a blanket or a mat to sleep on. Plaintiff alleges that the following day, January 20, 2012, he and the other inmates were taken back to their cells around 11:00 to 11:30 a.m. Plaintiff alleges that because the lock on his cell door had been broken, he and his cell mate were

3



placed in Cell 31 (B), which is a "stripped out" cell,[3] for about two hours. Plaintiff alleges that when he was finally returned to his cell, the toilets in two nearby cells were backed up and overflowing, causing Plaintiff's cell to be flooded with toilet water. Plaintiff alleges that he was made to stay in this cell for over thirty hours "with feces everywhere" with nothing to clean up with, and that he was also not allowed to take a shower "for several days". Plaintiff alleges he did not have any heat or any bed covers, and was required to each lunch and dinner in his cell.

Plaintiff alleges that on January 25, 2012 the Defendant Williams came by his cell and told him that another inmate wanted his law book back, and that he would give it back to him the next morning. Plaintiff alleges that when Williams came by Plaintiff's cell at breakfast time the following morning, Plaintiff turned away to the door to walk over to his locker when the Defendant Lyde came into Plaintiff's cell with two bags of food and "gave the Plaintiff a couple of pats on the butt", asking Plaintiff if he was going to eat breakfast that morning. Plaintiff alleges that after the officers left, he wrote a Staff Request to "Lt. Laurence" about what Lyde had done. Plaintiff alleges that, in an act of retaliation, Lyde wrote him up the following night for threatening to inflict harm on an employee. Plaintiff alleges that this charge was subsequently dismissed due to lack of evidence. Plaintiff alleges that on March 9, 2012 he went to talk to a psychiatrist after falling into "a stage of depression", and that he had also developed a "strong case of paranoia". Plaintiff alleges his psychiatrist prescribed him some medication to deal with the "sexual assault" he had suffered, as well as for some other problems he was having.

Plaintiff alleges that on March 11, 2012, a plumbing pipe backed up, causing Plaintiff's cell to flood. Plaintiff alleges he told several officers, including the Defendant Lyde, about

---

[3]No toilet, no light, no sink.



this flooding, but was refused supplies to clean up the mess, which Plaintiff alleges included feces. Plaintiff alleges that this mess did not get cleaned up until late the next morning by an officer on a different shift.  Plaintiff further alleges that he was denied a shower for 44 hours.

Plaintiff alleges that sometimes when the  unit was "locked" down, officers would come around at feeding time with a trash can or trash bag so that they could collect trash that inmates had dumped outside of their cells.  However, Plaintiff alleges that when some officers (including the Defendants Lyde and Cooper) were working, no trash was allowed to come out of the cells, leaving inmates with trash in their cells for up to 5 days at a time.  Plaintiff also alleges that during lock down, he and other inmates were retaliated against by being given inadequate meals, including such items as moldy bread or sour milk, and that sometimes they would not receive anything to drink at all, with inmates being told to drink the water from the sink.  Plaintiff alleges the water from the sink was unhealthy.  Plaintiff further alleges that officers would retaliate against inmates by not allowing them to shower from 8 to 13 days, and by not providing clean clothing or bedding or toiletries.

Plaintiff alleges that on March 8, 2012 he went to see the prison doctor (Dr. Holcomb) because he was suffering from a rash under his arms and stomach pains, and was prescribed some cream for his rash as well as some medication for his stomach.  Dr. Holcomb also ordered some blood work.  Plaintiff alleges the doctor commented to him that his stomach problems were being caused by his "sandwich diet", and that she had spoken to the Warden about changing the inmates' sandwich diet.  Plaintiff alleges he returned to sick call on March 27, 2012, still complaining about stomach problems as well as that he had started to develop a headache every afternoon.

Plaintiff alleges that on April 28, 2012, several correctional officers (including the Defendants Lyde and Cooper) conducted a search of Plaintiff's cell.  A prison knife was found during

5



this search by Defendant Cooper, and both Plaintiff and his cell mate were charged with possession of an escape tool and with damaging property. Plaintiff alleges he and his cell mate were both taken to the holding cell, and that when he returned to his cell on April 30, 2012, he was missing several items, to include two envelopes containing state and federal law rules and copies of Plaintiff's "case", an envelope containing Plaintiff's indictment "issues", a "dial roll on", some magazines, half a bottle of shampoo, and Plaintiff's stomach pills. Plaintiff also alleges one of his law books had been torn up and the pages were falling out of it.

Plaintiff alleges that on May 16, 2012, he was found guilty after a disciplinary hearing of the charges of possession of an escape tool and damaging property. Plaintiff alleges that his cell also had a hole that someone had been chiseling, which Plaintiff contends had already been there, but was nevertheless found guilty of damaging property. Plaintiff alleges that he subsequently had a meeting on June 11, 2012 with Classification Officer Ravenel and "Lt. King", and was told that his custody level was being changed, that he had to do 18 months in lockup, that he would then be sent to Ashley A side for 12 months, and that he also still had a riot charge pending. Plaintiff alleges, however, that he had already been found not guilty of the riot charge, and provided proof of this to Ravenel.

Plaintiff alleges that after being placed in security detention, he wrote several Requests to Staff forms to "Ms. Bailey", who responded that his escape tool charge had been updated to reflect an attempted escape, although these are two different charges with two different elements. Plaintiff also alleges that he was placed into a cell with no light and no "proper fire protection" because the sprinkler heads had been "busted for over a year". Plaintiff alleges that he made many requests for his light to be fixed, but that it took "several months" for maintenance to fix the light.



Plaintiff alleges that on July 12, 2012, when the nurse was giving out medication, the Defendant Williams was the escort. Plaintiff alleges that Williams tried to block the nurse from giving Plaintiff his medications, and that when Plaintiff told him he wanted to speak to a supervisor, Williams bent his arm backwards, bent his right wrist down real hard, "popping it", and then hit his arm with the cell door food service flap. Plaintiff alleges that Williams then cursed at him, sprayed him in the face with mace, and walked off. Plaintiff alleges Williams came back a few minutes later and made some additional derogatory comments to him, all of which was witnessed by Plaintiff's cell mate (David Mahaffey). Plaintiff also alleges that both he and his cell mate were not allowed to clean their cell and were denied a shower for over 24 hours.

Plaintiff alleges that on July 14, 2012, Williams was still harassing him, at which time Mahaffey threw urine on Williams. Plaintiff alleges Williams then sprayed them both with 144 grams of mace, shut the door, and walked off. Plaintiff alleges a "Nurse Tyson" was called and made aware that Plaintiff had asthma and could not breathe, and that he also informed the nurse about his wrist and asked to see a doctor. Plaintiff alleges Nurse Tyson told him that she would refer the matter to Dr. Holcomb, but that he was not allowed to clean his cell or shower to get the mace off of him until four days later, July 18, 2012.

Plaintiff also alleges that he and his cell mate were "stripped out" of all of their belonging, were left only in their boxer shorts, and were not provided with a mattress for 72 hours. Plaintiff alleges that during this period of time the cell still had not been cleaned of the mace. Plaintiff also alleges that Williams continued to harass him, including denying him the right to make a legal phone call. Plaintiff alleges numerous correctional officers knew about Williams' harassing conduct, and that he also filed request forms complaining about Williams' conduct. Plaintiff also

7



complained to his mental health counselor about Williams' conduct.

Plaintiff alleges that he went to sick call and had his wrist looked at by the nurse on August 3, 2012, and was prescribed some ibuprofen. Plaintiff also alleges he spoke to investigators on August 8, 2012 about the things Williams had been doing and saying to him. Plaintiff alleges that on August 14, 2012, Mental Health Counselor Fripp came to talk to the Plaintiff, escorted by Williams, but stated she could not pull Plaintiff out and talk to him separately because they were short of staff. Plaintiff alleges they were not short of staff, and that this was just an excuse. Williams was apparently asked to back up so Plaintiff could speak to his counselor, and Plaintiff then told his counselor that he feared for his life and that Williams had made death treats to him. Plaintiff also complained to his counselor that he was in lockup for a charge for which he had not been convicted. Plaintiff alleges the counselor told him that she did not have anything to do with security or classification issues.

Plaintiff alleges that on August 28, 2012 an officer "State" brought cleaning supplies to his cell, and that while he was cleaning his cell State and his cell mate got into an argument, at which time State sprayed Plaintiff and his cell mate with mace. Plaintiff alleges he requested to speak to the nurse due to his asthma, and that although the nurse came she would not check on him. Plaintiff subsequently complained to the night nurse that his chest was tight and it hurt to breath, but although the night nurse indicated she would check back with him, she never came back. Plaintiff also alleges that his cell was stripped out again on August 30, 2012, even though Plaintiff denies he was causing any disturbance or had made any threats. Plaintiff alleges that on August 30, 2012 he went to a disciplinary hearing and was found guilty of the charge of damaging property, a charge apparently relating to Plaintiff having damaged the light in his cell. Plaintiff alleges, however, that



he did not damage the light, that it was already damaged when he was put into the cell, and that the hearing officer (Mr. Blackwell) did not properly document the hearing. Plaintiff further alleges that he was again served with charges of damaging property on January 31, 2012 and again on May 11, 2012. Plaintiff was also charged with the prison knife offense, apparently by Officer Cooper, as a result of the targeted cell search on April 28, 2012.

In his **First Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights with respect to the conditions of his confinement, including subjecting Plaintiff to "corporal punishment". In his **Second Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights as a result of the incident and related actions from the prison riot of January 2012, in that he was subjected to excessive use of force and with respect to the conditions of the cell he was placed in. In his **Third Cause of Action**, Plaintiff alleges that the Defendants SCDC and Lyde violated his constitutional rights when Lyde inappropriately touched Plaintiff on the buttocks. In his **Fourth Cause of Action**, Plaintiff alleges that the Defendant SCDC has violated his constitutional rights by failing to properly train and supervise its employees resulting from the prison riot of January 2012. In his **Fifth Cause of Action**, Plaintiff alleges that the Defendants SCDC, Cooper and Lyde violated his constitutional rights on April 28, 2012 when Cooper and Lyde destroyed his property, while the Defendant SCDC violated his constitutional rights by failing to properly supervise its employees. In his **Sixth Cause of Action**, Plaintiff alleges that the Defendants Cooper and Lyde violated his constitutional rights on April 28, 2012 by destroying his legal materials and by failing to provide him with legal material and documents, and that the SCDC violated his constitutional rights by failing to properly supervise and train its employees. In his **Seventh Cause of Action**, Plaintiff alleges that the Defendants SCDC, Cooper and Lyde engaged in a conspiracy on

9



April 28, 2012 to deprive him of his civil rights and property. In his **Eighth Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights by improperly convicting him of a charge and by placing him in security detention for a charge he was never charged or convicted for. In his **Ninth Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights by failing to provide him with proper medical care through the improper training and/or supervision of its employees. In his **Tenth Cause of Action**, Plaintiff alleges that the Defendants SCDC and Williams violated his constitutional rights by Williams making inappropriate and threatening comments towards him, by subjecting him to excessive force, and by placing him in the strip cell for 72 hours. Plaintiff further alleges that the Defendant SCDC is liable for this conduct because it did not properly train or supervise it employees. In his **Eleventh Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights by failing to provide him with the minimum requirements of due process at his prison disciplinary proceedings. In his **Twelfth Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights when he was placed in a stripped out cell for no reason. In his **Thirteenth** and final **Cause of Action**, Plaintiff alleges that the Defendant SCDC violated his constitutional rights by providing him with improper medical care, including improper access to a medical health professional, and that it failed to properly train and supervise its employees with respect to these services. Plaintiff seeks monetary damages against the Defendants.

As exhibits to his Complaint, Plaintiff has attached a copy of a Request to Staff Member form dated April 25, 2013, in which Plaintiff complains that he is not being provided with sufficient copies of materials to pursue his legal cases. See generally, Plaintiff's Verified Amended Complaint, with attached Exhibit.

10



In support of summary judgment in the case the Defendant Troy Lyde has submitted an affidavit wherein he attests that he is employed by the SCDC, working at the Lieber Correctional Institution. Lyde attests that he never touched Plaintiff as he alleges, or if it was done it was purely accidental and/or unknown to him. Lyde further attests that on January 26, 2012, Plaintiff threatened him, stating that "[t]he next time you touch me, I am going to stab your ass". Lyde attests that the day before, Plaintiff had also verbally threatened him when he was passing out breakfast trays. Lyde attests that he therefore wrote up an incident report charging Plaintiff with verbal threats of harm to an SCDC employee, and also notified his supervisors of these incidents, who agreed that Plaintiff should be charged. Lyde attests that Plaintiff's disciplinary hearing as a result of this charge was apparently dismissed for not being timely, but that he did not dismiss the charge, nor was he ever notified of a hearing date.

Lyde further attests that on April 28, 2012, he and the Defendant Thomas Cooper along with several other officers performed a target cell search of Plaintiff's cell. Lyde attests that during this search a homemade weapon or chisel was discovered that had white powder on the sharp end, and that they also discovered a hole in the wall with white powder on the floor beneath, which appeared consistent with the powder on the chisel. Lyde attests that Plaintiff claimed ownership of the chisel, and that both Plaintiff and his cell mate were then charged with possession of an escape tool and damage to property. Finally, Lyde attests that he did not destroy any of Plaintiff's belongings, did not confiscate any of his legal materials, and did not observe anyone else destroy, damage, or confiscate any of Plaintiff's personal items. Lyde attests that, to his knowledge, the only item confiscated from Plaintiff's cell that day was the chisel, and that it is his understanding that Plaintiff was later convicted of both disciplinary charges. See generally, Lyde Affidavit.

11



The Defendant Thomas Cooper has submitted an affidavit wherein he attests that he is an employee of the SCDC, working at the Lieber Correctional Institution. Cooper attests that on the evening of April 28, 2012, he together with the Defendant Lyde and several other SCDC officers conducted a target cell search of Plaintiff's cell for the purpose of removing any contraband items found therein. Cooper attests that during this search he discovered an approximately seven inch metal rod with one end rounded, sharpened and covered in white powder inside the cell's air-conditioning vent. Cooper attests that he also located a new hole in the wall below the sink with a white powdery substance on the floor just below the hole. Cooper attests that this chisel is considered an escape tool by the SCDC, that Plaintiff claimed ownership of the chisel, and that both Plaintiff and his cell mate were charged with possession of an escape tool and damage to property. Cooper attests that it is his understanding that Plaintiff was convicted of both charges after a disciplinary hearing. Cooper attests that he did not destroy any of Plaintiff's belongings, did not confiscate any of his legal materials, and did not observe anyone else destroying, damaging, or confiscating any of Plaintiff's personal items. Cooper attests that, to his knowledge, the only item confiscated from Plaintiff's cell that day was the chisel, and that Plaintiff was later convicted of both disciplinary charges, which are considered major offenses by the SCDC. Finally, Cooper attests that he has never conspired with anyone regarding the Plaintiff. See generally, Cooper Affidavit.

The Defendant Wellington Williams has submitted an affidavit wherein he attests that he is an employee of the SCDC, working at the Lieber Correctional Institution. Williams attests that on July 12, 2012, he was escorting SCDC Nurse Markowitz for pill pass (medication administration) on SMU A wing, where Plaintiff was housed. Williams attest that as they approached Plaintiff's cell door, Plaintiff directed extremely vulgar language towards him and Nurse Markowitz. Plaintiff and



his cell mate both also refused to step back to the rear of their cells so that the nurse could safely place their medications on the food flap, and due to the fact that two nurses had been assaulted through the cell door flap by inmates during medication administration, the Warden had issued a directive that during medication administration the inmate is directed by the corrections officer escorting the nurse to step back away from the cell door.  Williams attests, however, that when he directed the Plaintiff "several times" to remove his hands from the food flap so that it could be secured, Plaintiff refused and even reached out with one hand and struck his [Williams] face shield, knocking it to the floor.  Williams attests that he then administered one short burst of mk 4 fogger into the cell, at which time Plaintiff removed his hands from the food service flap which Williams then secured.  Williams attests that Nurse Markowitz observed this incident and later medically cleared both inmates.  Williams attests that he also notified his supervisors and charged Plaintiff for his refusal to obey a direct command, but does not know the current status of this disciplinary charge.

Williams attests that, two days later, he was assisting another officer in collecting food trays on the SMU A wing, and that when he opened the food service flap on Plaintiff's cell door, Plaintiff's cell mate Mahaffey threw an unknown liquid substance on him that was later determined to be urine.  Williams attests that this urine struck his face shield and covered his vest and pants. Williams attests that, unfortunately, this is a common occurrence in the prison and creates a very dangerous situation for SCDC employees. Williams attests that Officer McCabe then directed a short burst of his mk 4 fogger into the cell while he [Williams] attempted to secure the food service flap. Williams attests, however, that Mahaffey blocked the flap with his arm and threw more unknown substances on both Williams and Officer McCabe.  Williams attests that he had to administer several



more bursts of chemical munition into the cell before Mahaffey complied.[4]  Williams attests that

when Mahaffey finally removed his arm from the flap and moved to the back of the cell, Plaintiff ran

towards the door and blocked the window with a mattress.  Williams attests that both medical and

supervisors were notified of the incident, and that it is his understanding that medical cleared Plaintiff

following the event.

Williams attests that while force was used in obtaining compliance in both of these

instances, it was used only after lesser measures (officer presence and verbal directives) were ignored

and after Plaintiff's cell mate had assaulted him.  Williams further attests that on both occasions the

force applied was done in accordance with his training, was done solely in a good faith effort to

maintain and restore discipline, and was not done in a malicious or sadistic manner to cause Plaintiff

harm.  Rather, only such force was applied as was necessary to restore and maintain order and

discipline due to the inmates' violent resistence.  Further, Williams attests he immediately notified

both medical and his supervisor that Plaintiff had been exposed to chemical munitions, Plaintiff was

evaluated by medical staff, and he is not aware of any injury Plaintiff suffered.  See generally,

Williams Affidavit.

The Defendants have also submitted an affidavit from Thierry Nettles, who attests that

he is a Major employed by the SCDC, working at the Lieber Correctional Institution.  Nettles attests

that on the night of January 18, 2012, inmates in the Ashley dorm at Lieber assaulted two officers,

took their keys and tore up everything inside the dorm unit.  Nettles attests that almost every window

in the dorm was broken, lights were pulled down throughout the unit, and most of the sprinkler heads

---

[4]Williams attests that, at one point, Mahaffey managed to knock his mk4 canister to the floor,
so he [Williams] had to use Officer McCabe's cannister.



were destroyed. Nettles attests that the dorm looked like a war zone, and that two officers had to be taken to the hospital. Nettles attests that the SCDC's rapid response team was deployed to quell the riot and secure the dorm and prison, which required the assistance of more than two hundred law enforcement officers from the tri-county area to make sure that no inmates escaped. Nettles attests that, once the area was secured, officers retrieved numerous homemade weapons from the unit, including more than 100 knives or shanks. Nettles attests that he is not aware of any inmates, including the Plaintiff, who were injured during the riot or during the time it took to secure the area, that all measures were taken to ensure both inmate and employee safety, and that the amount of force used to stop the riot and secure the dorm and prison was only applied in a good faith effort to maintain and restore discipline and the security of the institution. See generally, Nettles Affidavit.

In addition to these affidavits, Defendants have provided copies of the various incident reports documenting these incidents, disciplinary reports and hearing records, medical health summaries, inmate correspondence, and inmate offense histories relating to Plaintiff's claims. As attachments to his memorandum in opposition to summary judgment, Plaintiff has also submitted numerous copies of various Request to Staff Member forms, grievances, incident reports, pleadings, medical records, as well as various other documents, such as copies of correspondence.

Plaintiff has also submitted several affidavits. Inmate Jerman Barton attests on January 18, 2012, during the riot in the Ashley A Cell wing, he was "cuffed" and thrown on the ground in the "freezing cold". Barton attests that he was then placed in a holding cell with the zip tie cuffs on, which were cutting off his circulation. Barton attests that he stayed cuffed for over eight hours and did not have the use of a bathroom. Barton attests that he also needed medical attention due to a cut ear, that at or around 1 to 1:30 p.m. he was taken to a holding cell in the SMU where the

15



cuffs were removed, but they were not provided blankets or mattresses to sleep. Barton also makes similar complaints as the Plaintiff as to the quality of the food he received. <u>See</u> <u>generally</u>, <u>Barton Affidavit</u>.

Inmate John Holloway has submitted an affidavit in which he also complains about the quality of the food received after the riot of January 18, 2012. Holloway further attests that inmates were constantly dealing with other inmates flooding their cells and with officers and supervisors not allowing inmates to properly clean up after these floodings. Holloway also attests that inmates were denied adequate showers three times weekly and were forced to bathe in their sinks. <u>See</u> <u>generally</u>, <u>Holloway Affidavit</u>.

Inmate Reginald Walker has submitted an affidavit wherein he attests to similar facts, including specifically that he was not allowed to take a shower for 9 days, to 11 days, to 1 shower a week between January 27 and April 1, 2012. Walker also complains inmates were not allowed outside recreation. Walker also claims that "administration personnel were actually planning on killing me and all of those housed in Ashley unit". <u>See</u> <u>generally</u>, <u>Walker Affidavit</u>.

Inmate Danny Gilliam has submitted an affidavit attesting to similar facts. <u>See</u> <u>generally</u>, <u>Gilliam Affidavit</u>. Gilliam has also submitted a second affidavit, in which he attests that when he was Plaintiff's cell mate he witnessed Plaintiff giving the Defendant Williams a request that a "Captain Brighthorp" had signed approving Plaintiff a "legal phone call". Gilliam attests that Williams refused to give Plaintiff this phone call, and threw his request away. Gilliam further attests that Williams would harass and make fun of the Plaintiff to get Plaintiff upset, including using



racially derogative terms.[5]  See generally, Second Gilliam Affidavit.

Inmate Larry Cummings has submitted an affidavit wherein he attests that on September 24, 2012 he witnessed Williams call his cell mate a "sick cracker" and that he was also going to tell "everyone" about Plaintiff's charges.  Cummings also attests the Williams said he would put poison in his cell mate's food, and that Williams would threaten inmates.  See generally, Cummings Affidavit.

### Discussion

Defendants have moved for summary judgment on all of Plaintiff's claims.  Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Rule 56, Fed.R.Civ.P.  The moving party has the burden of proving that judgment on the pleadings is appropriate.  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991).  Once the moving party makes this showing, however, to avoid summary judgment the opposing party must respond to the motion with specific facts showing there is a genuine issue for trial.  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists.  Weller v. Dep't of Social Services, 901 F.2d 387

---

[5]Plaintiff is white, while Williams is African-American.



(4th Cir. 1990).

## I.

### (Federal Claims Against the Defendant SCDC)

In each of his thirteen causes of action, Plaintiff has sued the Defendant SCDC, <u>inter alia</u>, seeking monetary damages for violations of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff also indicates in each of his causes of action that the Defendant SCDC "is sued under South Carolina law", although he does not state the basis for his state law claims.

Plaintiff cannot maintain a suit for damages against the state of South Carolina in federal court under § 1983. The SCDC is a state agency. As such, Plaintiff's federal causes of action are against the State of South Carolina itself; <u>Coffin v. S.C. Dep't of Soc. Servs.</u>, 562 F. Supp. 579, 583 (D.S.C. 1983); and it is well settled that the Eleventh Amendment to the United States Constitution divests this Court of jurisdiction to entertain a § 1983 damages suit brought against the State of South Carolina. <u>See</u> <u>Alden v. Maine</u>, 527 U.S. 706 (1999); <u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44 (1996); <u>Will v. Mich. Dep't of State Police</u>, 491 U.S. 58, 61–71 (1989); <u>Alabama v. Pugh</u>, 438 U.S. 781, 782 (1978). The Eleventh Amendment forbids a federal court from rendering a judgment against an unconsenting state in favor of a citizen of that state; <u>Edelman v. Jordan</u>, 415 U.S. 651, 663 (1974); and state agencies and state instrumentalities, such as the SCDC, share this immunity when they are the alter egos of the State. <u>See</u> <u>Regents of the Univ. of Cal. v. Doe</u>, 519 U.S. 425, 429 (1997).

While the United States Congress can override Eleventh Amendment immunity through legislation, Congress has not overridden the states' Eleventh Amendment immunity in § 1983 cases. <u>See</u> <u>Quern v. Jordan</u>, 440 U.S. 332, 343 (1979). Further, although a State may consent to a

18



suit in a federal district court, <u>Pennhurst State School & Hospital v. Halderman</u>, 465 U.S. 89, 99 &

n.9 (1984), the State of South Carolina has not consented to such actions.  <u>See</u> S.C. Code Ann. § 15-

78-20(e).  Additionally, since the State of South Carolina has not waived its Eleventh immunity from

suit in state court for federal constitutional claims, the Defendants' voluntary removal of this case to

federal court has not effected a waiver of the State's immunity from suit for these claims.  <u>See</u>

<u>Stewart v. North Carolina</u>, 393 F.3d 484 (4th Cir. 2005)[finding no waiver where state has not

consented to suit in its own courts for such claims]; <u>Lapides v. Board of Regents of the Univ. System</u>

<u>of Georgia</u>, 535 U.S. 613, 619 (2002)[A state's voluntary appearance in federal court waives

sovereign immunity only with respect to claims where a state has consented to suit in its own courts

for such claims]; <u>cf</u>. <u>Arnold v. South Carolina Department of Corrections, et al.</u>, No. 11-712, 2012

WL 684020, at * 2 (D.S.C. Jan. 3, 2012), <u>adopted by</u>, 2012 WL 684018 (D.S.C. Mar. 2, 2012).

Accordingly, Plaintiff cannot pursue his claims against the  SCDC in a § 1983 action.

Therefore, as Plaintiff may not pursue a damages claim against the SCDC in this

federal court under § 1983, the Defendant SCDC is entitled to dismissal as a party Defendant in this

case, at least with respect to any claims being asserted against this Defendant under § 1983.  Further,

as the SCDC is the only named Defendant in Plaintiff's First, Second, Fourth, Eighth, Ninth,

Eleventh, Twelfth and Thirteenth Causes of Action, those causes of action should all be dismissed

to the extent they assert claims under § 1983.[6]

---

[6]Of Plaintiff's remaining Causes of Action, Plaintiff only seeks damages against any
Defendant other than the SCDC in his Fifth and Sixth Causes of Action.  In those two Causes of
Action, Plaintiff seeks damages against the Defendants Lyde and Cooper in addition to the SCDC.
In all of Plaintiff's other Causes of Action, including his Third, Seventh, and Tenth Causes of Action
(the remaining causes of action which are not recommended for dismissal hereinabove to the extent
Plaintiff's claims are asserted under § 1983), Plaintiff only seeks damages against the SCDC.
(continued...)



## II.

### (Federal Claims in Third Cause of Action)

In his Third Cause of Action, Plaintiff asserts that the Defendant Lyde violated his constitutional rights when he "knowingly and willfully inappropriately touched Plaintiff on the buttock several times". Plaintiff's specific allegations with respect to this claim are that Lyde came into Plaintiff's cell with two bags of food in one hand "and gave the Plaintiff a couple of pats on the butt, smiled and asked the Plaintiff if he was going to eat [breakfast] that morning". Amended Complaint, ¶ 41.

As an employee of the Department of Corrections, Lyde is subject to suit for damages under § 1983 in his individual capacity. Will v. Michigan Dep't of State Police, 491 U.S. at 71; Hafer v. Melo, 112 S.Ct. 358, 365 (1991); Goodmon v. Rockefeller, 947 F.2d 1186 (4th Cir. 1991); Inmates v. Owens, 561 F.2d 560 (4th Cir. 1977).[7] However, even when assumed to be true for purposes of

---

[6](...continued)
However, giving Plaintiff's Complaint the liberal construction to which he is entitled, even though Plaintiff has only sought relief against the Defendant SCDC in his Third, Seventh, and Tenth Causes of Action, since Plaintiff does specifically mention by name one or more of the individually named Defendants in the body of those causes of action, the undersigned has liberally construed those causes of action as also seeking damages against those Defendants in their individual capacities.

[7]In their Answer, Defendants assert the affirmative defense of failure to exhaust administrative remedies by the Plaintiff with respect to his constitutional claims. Title 42 U.S.C. § 1997(e)(a) provides that; "[n]o action shall be brought with respect to prison conditions under section 1983 of this Title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." However, it is the Defendants who have the burden of showing that Plaintiff failed to exhaust his administrative remedies; see Anderson v. XYZ Correctional Health Services, Inc., 407 F.3d 674, 683 (4th Cir. 2005) [inmate's failure to exhaust administrative remedies is an affirmative defense to be both pled and proven by the Defendant]; Jones v. Bock, 127 S.Ct. 910 (2007); and while the Defendants have asserted failure to exhaust as a defense in their Answer, they have provided no evidence (or even argument) to support a dismissal of Plaintiff's claims on this basis. Therefore, the Defendants are
(continued...)



summary judgment, Plaintiff's allegations with respect to this claim simply fail to set forth a constitutional violation. First, although Plaintiff is not required to show that he suffered more than a de minimis injury to maintain an excessive force claim; see Wilkins v. Gaddy, 130 S.Ct. 1175, 1179-1180 (2010) [Noting that the notion that significant injury is a threshold requirement for stating an excessive force claim was rejected in Hudson v. McMillian, 503 U.S. 1, 7 (1992)]; the "absence of [a] serious injury" nevertheless remains relevant in an Eighth Amendment inquiry. Wilkins, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to Hudson, 503 U.S. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). Here, Plaintiff received no physical injury, and the mere "touch" of his buttocks by the Defendant Lyde under the circumstances alleged fails to give rise to a constitutional claim for excessive use of force.

To the extent Plaintiff's claim is not based on an alleged excessive use of force, but is instead simply based on an inappropriate touching of him by Lyde, Plaintiff has again failed to present facts to show a constitutional violation. Cf. Boddie v. Schnieder, 105 F.3d 857, 861 (2nd Cir. 1997)[No Eighth Amendment claim where plaintiff asserted only a small number of incidents in which he was "verbally harassed, touched and pressed against without his consent," with no single incident being severe enough to rise to the level of an Eighth Amendment violation]; Hughes v. Smith, 237 F.Appx. 756, 759 (3rd Cir. 2007)[Holding that a single pat-down frisk in which a correctional officer allegedly touched Plaintiff's testicles through his clothing, accompanied by no

---

[7] (...continued)
not entitled to dismissal of Plaintiff's claims on the grounds of failure to exhaust.



overt sexual comments did not rise to the level of an Eighth Amendment violation]; Berryhill v. Schriro, 137 F.3d. 1073, 1076 (8th Cir. 1998)[No Eighth Amendment claim where Plaintiff suffered nothing more than a brief unwanted touch on his buttocks with no evidence that the incident involved undue force or sexual assault or advancement]; Williams v. Silverman, No. 12-974, 2013 WL 6578980, at * 4 (E.D.Pa. Dec. 16, 2013).

Therefore, the Defendant Lyde is entitled to summary judgment on this claim.

## III.

### (Federal Claims in Fifth, Sixth and Seventh Causes of Action)

In his Fifth, Sixth and Seventh Causes of Action, Plaintiff complains about the actions of the Defendants Cooper and Lyde on April 28, 2012. Plaintiff alleges that on that date these two Defendants, together with some other correctional officers, conducted a target search of his cell, and that after an icepick was found in the cell both Plaintiff and his cell mate were charged with possession of an escape tool and with damaging property. This resulted in both inmates being taken to a holding cell, and Plaintiff alleges that when he was eventually returned to his cell on April 30, 2012, some of his property was missing, to wit: two envelopes containing copies of state and federal laws and rules along with "copies of the Plaintiff's [unidentified] case", an envelope that had copies of Plaintiff's "indictment issues" in it, an envelope that had Plaintiff's "grand jury issues" in it, the paperclips that had been holding together his legal work were gone and the "papers were everywhere", a "dial roll on", several magazines, a half bottle of VO5 shampoo, and Plaintiff's stomach pills. Plaintiff also alleges that one of his "expensive law books" was torn up and the pages were falling out of it. See Amended Complaint, ¶ ¶ 64-67, 69.

In his Fifth Cause of Action, Plaintiff alleges that the Defendants Cooper and Lyde



effected an "unreasonable seizure" of his legal papers and effects, causing a "severe deprivation of the ability to litigate his claim of actual innocence".  In his Sixth Cause of Action, Plaintiff alleges that the Defendants Cooper and Lyde violated his right of meaningful access to the Courts by destroying or causing to be destroyed the envelopes containing his legal materials, and by failing to provide photocopies of legal material and documents for Plaintiff to use to support his claims.  See also, Amended Complaint, ¶ 162.  In his Seventh Cause of Action, Plaintiff alleges that, through their actions, the Defendants Cooper and Lyde engaged in a conspiracy to violate his civil rights.  The evidence submitted to the Court fails to support these claims.

First, even if this Court assumes as true Plaintiff's allegation that his personal property was lost or mishandled by Lyde or Cooper, such conduct does not amount to a constitutional claim. Plaintiff has available state court remedies to pursue this claim; see S.C.Code Ann. § 15-78-10, et. seq.;[8] and because South Carolina has an adequate post-deprivation remedy for an alleged deprivation of property, Plaintiff's due process rights were not violated, even if it is assumed a correctional officer lost or mishandled his personal property. Hudson v. Palmer, 468 U.S. 517-518 (1984); McIntyre v. Portee, 784 F.2d 566-567 (4th Cir. 1986); see also Ricci v. Paolino, No. 91-1994, 1992 WL 63521 at **2 - **3 (1st Cir. April 1992); cf. Longmoor v. Nilsen, 329 F.Supp. 289, 300-302 (D.Conn. July 23, 2004).  The United States Court of Appeals for the Fourth Circuit has held that a federal district court should deny § 1983 relief if state law provides a Plaintiff with a viable remedy for the loss of personal property — even if the deprivation was caused by an employee of the state, an employee

---

[8]Section 15-78-30 and its subparts encompass a loss of property proximately caused by a person employed by the State of South Carolina, a state agency, or political subdivision of the state while acting within the scope of his or her employment. Plaintiff's claims relating to personal property are cognizable under the South Carolina Tort Claims Act because the SCDC is a subdivision of the State of South Carolina.



of a state agency, or an employee of a political subdivision of a state. <u>Yates v. Jamison</u>, 782 F.2d 1182, 1183-84 (4th Cir. 1986).[9] Here, Plaintiff has an adequate state-court remedy for such personal property issues under the South Carolina Torts Claim Act against any employees responsible for the loss.

Although prisoners may pursue property deprivation claims against state officials under 42 U.S.C. § 1983 under some circumstances, such as where the deprivation is pursuant to an official policy, such is not the case under the facts presented here. There is no allegation, nor any evidence, that any prison policy in place allows correctional officers to mishandle inmate's personal property. <u>See</u> <u>Lawrence v. Swanson Inmate Commissary Services</u>, No. 97-6429, 1998 WL 322671 (4th Cir. June 4, 1998) [deprivation claims as a result of negligence fail to set forth a claim of constitutional magnitude]; <u>cf</u>. <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986); <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986). Therefore, this claim is without merit.

To the extent Plaintiff asserts that the Defendants' conduct denied him access to the courts, Plaintiff has presented no evidence whatsoever to give rise to a genuine issue of fact as to whether he was denied access to the courts sufficient to survive summary judgment. While Plaintiff has provided an attachment to his Complaint showing he filed a Request to Staff Member seeking photocopies of certain legal materials and documents, the response to that request indicates that Plaintiff had been advised on numerous occasions that documents that have been solely originated, written, typed or created by an inmate are not copied. <u>See</u> Exhibit to Amended Complaint. There

---

[9]<u>Yates</u> has been partially superannuated for cases where Plaintiffs allege deprivations of intangible interests, such as a driver's license or "liberty[.]" <u>Plumer v. Maryland</u>, 915 F.2d 927, 929-32 & nn. 2-5 (4th Cir. 1990); <u>see also</u> <u>Zinermon v. Burch</u>, 494 U.S. 113 (1990). Nevertheless, the holding in <u>Yates</u> is still binding on lower federal courts in the Fourth Circuit in cases involving deprivations of personal property.



is nothing improper about this response or policy.  Cf. Jackson v. Florida Dep't of Financial Servs.,

479 Fed. Appx. 289, 292-293 (11th Cir. 2012)["This Court has never held that a prisoner's right of

access to the courts entitles a prisoner-plaintiff, even one proceeding informa pauperis, to free copies

of court documents . . . ."]; Johnson v. Moore, 948 F.2d 517, 521 (9th Cir. 1991) [there is no

constitutional right to free photocopies]; Young v. Larkin, 871 F.Supp. 772, 782 n. 19 (M.D.Penn.

1994) [there is no constitutional right to free photocopies]; Harrell v. Keohane, 621 F.2d 1059, 1061

(10th Cir. 1980); Dugar v. Coughlin, 613 F.Supp. 849, 853 (S.D.N.Y. 1985) [indigent litigants are

not entitled to free photo-copies or unlimited free postage (prisoner case)]; Carroll v. North Carolina

Dep't of Corrections, No. 91-7562, 1991 WL 158146 (4th Cir. May 20, 1991) [pro se prisoners may

handwrite legal papers to submit for submission to the court].[10]  Further, Plaintiff has submitted no

evidence to show that his access to the Courts was hindered by any restrictions placed upon him by

the prison.  To the contrary, Plaintiff's numerous and voluminous filings in the case at bar refute such

a claim.  Hartsfield v. Mayer, No. 95-1411, 1996 WL 43541 at * 3 (6th Cir. Feb. 1, 1996) [Noting

that Petitioner's voluminous pleadings demonstrated he had access to substantial amounts of paper

with which to prosecute his legal actions.]; see also Bonga v. Caruso, No. 07-190, 2007 WL 1686336

---

[10]In some of Plaintiff's Request to Staff or Grievance form exhibits, as well as in his brief, Plaintiff appears to also claim that the Defendants' failure to provide him with copies of certain documents was in violation of one or more prison polices.  However, even if the Court were to assume for purposes of summary judgment that one or more of the Defendants violated prison policies in their handling of Plaintiff's copy requests, any violation of such policies does not constitute a violation of Plaintiff's constitutional rights, and is therefore not assertable in a § 1983 action.  See Keeler v. Pea, 782 F.Supp. 42, 44 C.D.S.C. 1992); cf. Scott v. Hamidullah, C/A No. 3:05-3027-CMC-JRM, 2007 WL 904803 *5 n. 6 (D.S.C. March 21, 2007) (citing Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990)); Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that defendants did not follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing Riccio, 907 F.2d at 1469 [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]).



at * 6 (W.D.Mich. June 8, 2007)["An indigent prisoner's constitutional right to legal resources and

materials is not . . . without limit."]; Therrien v. Martin, No. 07-1285, 2007 WL 3102181 at * 6

(D.Conn. Oct. 19, 2007)[Prisoner is not entitled to unlimited resources to litigate his case].

Additionally, Plaintiff has failed to identify any court proceeding in which he has been prejudiced by

an alleged lack of access to the courts. Magee v. Waters, 810 F.2d 451, 452 (4th Cir. 1987) ["Courts

have required a showing by a complaining prisoner of actual injury or specific harm to him before

a claim of lack of access to the courts will be sustained"]; Cochran v. Morris, 73 F.3d 1310, 1317 (4th

Cir. 1996) [Dismissal of access to court claim proper where inmate relied on conclusory allegations

and failed to identify any actual injury].[11]  Therefore, this claim is without merit.  Johnson v. Reno

Police Chief, 718 F.Supp. 36, 38 (D.Nd. 1989)["Even a pro se plaintiff may not rely wholly on

conclusory allegations, but rather must allege facts which, if proven would entitle the plaintiff to

relief"]; see Lewis v. Casey, 518 U.S. 343, 349-353 (1996)[Inmate alleging denial of access to the

courts must be able to demonstrate "actual injury" caused by the policy or procedure at issue].

        Finally, as Plaintiff has failed to show any conduct which resulted in the deprivation

of a constitutional right with respect to his cell search, alleged loss of property or alleged denial of

access to the Courts, he cannot maintain a "conspiracy" claim against these two Defendants.

Marshall v. Odom, 156 F.Supp. 2d 525, 532 (D. MD. 2001)["To establish a civil conspiracy under

§ 1983, [the plaintiff] must present evidence that the [defendants] acted jointly in concert and that

some overt act was done in furtherance of the conspiracy which resulted in [his] deprivation of a

---

[11]In some of Plaintiff's exhibits (primarily Request to Staff forms and some grievances),
Plaintiff references a "PCR" action or "federal" cases.  No specific harm has been noted with respect
to any such cases, however.  Plaintiff has also submitted copies of orders from state ALC
proceedings, but again these exhibits fail to reflect any harm Plaintiff suffered due to any alleged
inability to litigate his claims.



constitutional right."], citing <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir.1996). Therefore, this claim is also without merit. <u>Wetherington v. Phillips</u>, 380 F. Supp. 426, 428-429 (E.D.N.C. 1974), aff'd., 526 F.2d 591 (4th Cir. 1975)[The generalized allegations of a civil conspiracy are not sufficient to maintain a claim under § 1983].

## IV.

### (Federal Claims in Tenth Cause of Action)

In his Tenth Cause of Action, Plaintiff alleges that the Defendant Williams violated his constitutional rights by making racist comments and threats toward the Plaintiff (Plaintiff is white and Williams is black), by denying him "legal calls", and by subjecting him to excessive use of force in July of 2012.[12]

With respect to Plaintiff's general and conclusory statement that Williams on one occasion denied him "legal calls" that he had been approved to make, he has failed to set forth a constitutional claim for the reasons already discussed in Section III of this opinion, <u>supra</u>. <u>Magee</u>, 810 F.3d at 452 ["Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]. With respect to Plaintiff's claim that Williams used foul or racist language against him, even if assumed to be true for purposes of summary judgment, this allegation also fails to set forth a claim of a constitutional magnitude. <u>Malsh v. Austin</u>, 901 F.Supp. 757 (S.D.N.Y. 1995)["Verbal assault, standing alone, is not a . . . cognizable injury in a 1983 civil rights action"]; <u>Sluys v. Gribetz</u>, 842 F.Supp. 764, 765 n.1 (S.D.N.Y. 1994) aff'd., <u>Sluys v. Gribetz</u>, 41 F.3d 1503 (2d Cir. 1994); <u>Siglar v. Hightower</u>, 112 F.3d

---

[12]Plaintiff also references in this Cause of Action allegedly unconstitutional conduct committed by a "Sgt. Von Mutis". However, no such individual is named as a Defendant in this lawsuit.



191, 193 (5th Cir. 1997); Batista v. Rodriguz, 702 F.2d 393, 398 (2nd Cir. 1985); Ajaj v. United States, 479 F.Supp. 2d 501, 538 n. 16 (D.S.C. 2007); Musto v. Trinity Food Service, Inc., No. 07-231, 2010 WL 3565723 at * 13 (M,D.Fla. 2010)[Although "racial epithets are repulsive and generally the weapon of the uncivilized, . . . verbal harassment does not state a claim for relief in a federal civil rights action."]  Therefore, while it is indeed reprehensible if correctional officers are engaging in such conduct, it is not the type of claim Plaintiff can pursue in a § 1983 lawsuit.

With respect to his excessive force claim, Plaintiff alleges that Williams "maliciously and sadistically inflicted injury on Plaintiff by application of undue force.  Force wasn't justifiable self-defense, wasn't needed for protection of others, protection of property, or wasn't used to prevent an escape".  Amended Complaint, ¶ 200 (B).  Specifically, Plaintiff alleges that on July 12, 2012, Williams tried to block the nurse from giving Plaintiff his medications, and that when Plaintiff told him he wanted to speak to a supervisor, Williams bent his arm backwards, bent his right wrist down real hard, "popping it", and then hit his arm with the cell door food service flap.  Plaintiff has also submitted a copy of what is represented to be a sworn statement by his cell mate Mahaffey, wherein Mahaffey states that when Plaintiff stuck his arm through the cell flap to prevent Williams from shutting it, Williams "grabbed [Plaintiff's] right arm and bent his wrist" and cursed at him.  See Plaintiff's Exhibit 10-C.  Plaintiff also alleges that Williams cursed at him, sprayed him in the face with mace, and walked off.  Plaintiff further alleges that on July 14, 2012, after his cell mate Mahaffey threw urine on Williams, that Williams sprayed them both with 144 grams of mace, shut the door, and walked off.  Plaintiff alleges that although he complained to the nurse, he was not allowed to clean his cell or shower to get the mace off of him until four days later, July 18, 2012.  See generally, Amended Complaint, ¶ ¶ 86-92, 95-99, 101.



Williams has provided an affidavit wherein he attests that when he and Nurse Markowitz approached Plaintiff's cell on July 12, 2012 for the purpose of medication administration, Plaintiff directed extremely vulgar language towards them and then both Plaintiff and his cell mate refused to step back to the rear of the cell so the nurse could place their medications on the food flap. Williams further attests that although he directed the Plaintiff "several times" to remove his hands from the food flap so that it could be secured, Plaintiff refused and even reached out with one hand and struck Williams' face shield, knocking it to the floor. Williams attests that he then administered one short burst of MK 4 fogger into the cell, at which time Plaintiff removed his hands from the food service flap, which Williams then secured. Williams attests that Nurse Markowitz observed this incident and later medically cleared both inmates.

Williams attests that two days later, while he was assisting another officer in collecting food trays, when he opened the food service flap on Plaintiff's cell door Plaintiff's cell mate Mahaffey threw urine on him, striking his face shield and covering his vest and pants. Williams attests that the other officer (Office McCabe) then directed a short burst of his MK 4 fogger into the cell while Williams attempted to secure the food service flap, but that Mahaffey blocked the flap with his arm and threw more unknown substances on both himself and Officer McCabe. Williams attests that he then administered several more bursts of chemical munition into the cell from McCabe's canister (Mahaffey had managed to knock Williams' canister to the floor) before Mahaffey finally complied. However, when Mahaffey finally removed his arm from the flap and moved to the back of the cell, Williams attests that Plaintiff then ran towards the door and blocked the window with a mattress.

Williams attests that, while force was used in obtaining compliance in both of these



instances, it was used only after lesser measures, including officer presence and verbal directives, were ignored, and after Plaintiff's cell mate had assaulted him; that no force was administered in a malicious or sadistic manner to cause Plaintiff harm; but was administered solely in a good faith effort to maintain and restore discipline; with only such force being applied as was necessary to restore and maintain order and discipline. Williams further attests that Plaintiff was evaluated by medical staff, and that he is not aware of any injury Plaintiff suffered as a result of either incident. See generally, Williams Affidavit.

   In addition to Williams' affidavit, the Defendants have also submitted a copy of the incident report dated July 12, 2012, which supports the information set forth by Williams in his affidavit. Further, a computer printout attached to this incident report indicates that a total of 14 grams of chemical munitions was used during the incident of that date, that appropriate officials were notified of the incident, and that Plaintiff was thereafter seen by Nurse Markowitz. See Defendants' Exhibit 5. The Defendants have also submitted a copy of a medical summary from the SCDC Health Services Department, showing that Plaintiff was seen following the incident of July 12, 2012, that Plaintiff was breathing without difficulty and had no complaints other than an itching face (with the notation that Plaintiff had rinsed with water), that no treatment was needed or provided, and that Plaintiff received his medications without issue. See Defendants' Exhibit 6.

   Defendants have also provided a copy of the incident report prepared after the incident of July 14, 2012, which again supports the facts set forth by Williams in his affidavit.[13] A computer printout is attached to this document showing that a total of 101 grams of chemical munitions were

---

   [13]Plaintiff was apparently also involved in another incident with another employee the previous day, July 13, 2012, for which he was charged and convicted. See Defendants' Exhibits 7-8.



used on this date from Officer McCabe's canister, while 46 grams were used from Williams' canister. This computer printout further reflects that both inmates were seen by medical following this incident and that all appropriate officials were notified. See Defendants' Exhibit 9. A medical summary from SCDC Health Services has also been provided as an exhibit, which reflects that Plaintiff was seen following this incident complaining of a history of asthma, but that Plaintiff was found to be breathing without difficulty and was in no distress. See Defendants' Exhibit 10.

Plaintiff has also submitted several exhibits relating to these incidents, which include copies of SCDC Health Services medical summaries. Plaintiff's exhibits include the two medical summaries submitted as exhibits by the Defendants, and further reflect that, following Plaintiff being seen in medical on July 14, 2012, he was seen again on July 17, 2012. Plaintiff indicated during this medical visit that his cell mate was responsible for the incident of July 14, 2012. Significantly, none of these three medical entries reflect any injury, or complaints of injury, to Plaintiff's arm.

In a medical entry dated August 4, 2012, Plaintiff was seen secondary to a claimed wrist injury that Plaintiff stated happened on July 12, 2012. Plaintiff stated that he had complained about this injury several times but that his wrist had never been evaluated. Although he stated that his wrist hurt, on examination no redness or swelling was noted and Plaintiff had full range of motion. Plaintiff was then seen again on August 8, 2012 for other issues, with no mention being made of any wrist injury in this medical entry.

The medical summaries reflect that Plaintiff was seen again in the medical clinic on August 14, 2012, during which he was very aggressive and belligerent. While other issues were addressed, there is again no indication of any complaints or examinations relating to any wrist injury. Indeed, the medical records do not reflect that Plaintiff mentioned his wrist again until August 23,



2012, when he signed up for a medical clinic visit to "discuss his wrist". Plaintiff thereafter had a follow up visit on September 1, 2012, where he complained of sharp pain and tenderness in his wrist. Plaintiff exhibited difficulty extending the fingers of his right hand and told the nurse that he kept his wrist immobilized with a handmade bandage. Medical personnel obtained an x-ray of Plaintiff's wrist, which showed Plaintiff's wrist to be within normal limits, and no new orders were issued. <u>See Plaintiff's Exhibits M-12 - M-15</u>.

Plaintiff has also submitted copies of some handwritten Request to Staff Member forms from July and August 2012, where he is complaining about his wrist. One of these forms, dated July 30, 2012, bears a notation that his wrist exhibited no redness and that he had full range of motion. Nevertheless, Plaintiff was prescribed some Motrin. A Request to Staff Member form from July 13th reflects that Plaintiff was complaining about his wrist, and bears the response notation that Plaintiff had been seen multiple times for this complaint. <u>See Plaintiff's Exhibit M-31</u>. A Request to Staff Member form dated August 15, 2012, includes a response to the Plaintiff that states: "You were seen in sick call 8/4/12 & the nurse documented you had no redness or edema & had full range of motion. I am not sure what you want done?". <u>See Plaintiff's Exhibits M-26 - M-29</u>. A Request to Staff Member form dated September 16, 2012 includes the response notation: "The x-ray was normal". <u>See Plaintiff's Exhibit M-37</u>.

When reviewing a claim of constitutionally excessive force, the Court should consider 1) the need for the application of force, 2) the relationship between the need and the amount of force that was used, 3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them, 4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner. <u>Iko v. Shreve</u>, 535 F.3d 225, 239



(4th Cir. 2008); <u>Whitley v. Albers</u>, 475 U.S. 312, 321 (1986); <u>Majette v. GEO Group, Inc.</u>, No. 07-591, 2010 WL 3743364, at * 6 (E.D.Va. Sept 22, 2010); <u>see Hudson v. McMillian</u>, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]. Here, the evidence (considered in the light most favorable to the Plaintiff) shows that on July 12, 2012 Plaintiff and Williams engaged in a verbal confrontation during which Plaintiff had his arm protruding outside of his cell through the cell door flap. Williams attests that the Warden had issued a directive that during medication administration, inmates must step back away from the cell door before the nurse can administer medications through the cell door because two nurses had been assaulted through the cell door flap by inmates during medication administration. Plaintiff alleges that after Williams bent his arm and wrist, he sprayed him with mace, which Williams admits. Williams attests that he had to administer one short burst of MK 4 fogger into the cell to get Plaintiff to remove his hands from the food service flap, and the computer records provided to the Court as exhibits confirm that only a small amount of fogger was used in this instance. Further, the medical records (including Plaintiff's own exhibits) fail to show that Plaintiff suffered any significant injury as a result of this incident, or indeed any injury at all. <u>Cf</u>. <u>Brown v. Powell</u>, No. 12-3057, 2014 WL 691662, at * 3-5 (D.S.C. Feb. 21, 2014)[Discussing relationship of significance of injury to excessive force claim].

        With respect to the incident of July 14, 2012 (again considered in the light most favorable to the Plaintiff), Plaintiff concedes that his cell mate threw urine on Williams, and Defendants accept that both Plaintiff and his cell mate were sprayed with over 100 grams of mace as a result of this incident. Williams attests that several bursts of mace were administered because Mahaffey threw urine and additional unknown substances on both Williams and Officer McCade



more than once, and also was blocking the cell door flap with his arm, and that this was necessary to try and gain control of the situation. Plaintiff also concedes that after he complained that he had asthma and could not breathe, the nurse was called, and the medical records provided to this Court as exhibits show that Plaintiff was found to be breathing normally, was in no distress, and that no injuries were suffered by the Plaintiff as a result of this incident.

While the facts cited hereinabove (considered in the light most favorable for the Plaintiff) show that force was used against the Plaintiff, they are not sufficient to give rise to a genuine issue of fact as to whether *constitutionally* excessive force was used. Simply put, not every use of force by a prison guard against a prisoner warrants a federal claim. Cf. Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]; Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; see also Jennings v. Peiffer, 110 Fed. Appx. 643, 646 (6th Cir. Sept. 17, 2004) (quoting Combs v. Wilkinson, 315 F.3d 548, 557 (6th Cir. 2002)[Affirming summary judgment in favor of prison official and noting "that the use of mace to control a prison inmate is not malicious or sadistic" per se]. It is unfortunately a fact of life that prisons are dangerous places housing dangerous people under oftentimes tense and strained conditions and circumstances. Having a prisoner engage a correctional officer in a verbal confrontation, engage in unauthorized conduct such as dangling arms out of cell door flaps, and even (with respect to the second incident) throwing urine or other unidentified substances on correctional officers, is sufficient to give rise to a reasonable perception on the part of the prison official of a potential threat, and the fact that some amount of force was used by Williams in both of these



34

incidents to take control of the situation does not by itself rise to the level of a constitutional violation. The evidence reflects that a minimal amount of force was used, and ceased once the situation was deemed to be under control.

In order to avoid summary judgment, the evidence must be sufficient to create a genuine issue of fact as to whether the amount of force used was constitutionally *excessive*, and in light of the circumstances as set forth in the evidence and the minimal of force used as is shown by the documentary evidence, the undersigned does not find that a genuine issue of fact exists as to whether a *constitutionally excessive* amount of force was used in either of these two incidents. Williams, 77 F.3d at 761 [because prison officials are entitled to use appropriate force to quell prison disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm]; see also Johnson, 481 F.2d at 1033 ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]; cf. Bell v. Wolfish, 441 U.S. 520, 540 (1979) ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"].

This conclusion is further bolstered by the fact that there is no evidence to show that Plaintiff received any discernable injuries as a result of either of these two incidents. Specifically, the evidence reflects that Plaintiff was seen by medical personnel following both of these incidents, and also received subsequent follow up medical consultations, and there is no indication in any of the medical records submitted by either the Defendants or the Plaintiff to show that Plaintiff suffered any significant injuries, if any at all, as a result of these two incidents. Sylvia Dev. Corp. v. Calvert



County, Md., 48 F.3d 810, 818 (4th Cir. 1995)[Explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range of probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary"(internal quotation marks omitted)].  Plaintiff's own conclusory and self-serving statements that his wrist was injured or that he suffered breathing problems as a result of these incidents is not sufficient, absent any supporting evidence to support these claims, to avoid summary judgment.  See Strickler v. Waters, 989 F.2d 1375, 1380-1381 n. 9 (4th Cir. 1993) [the mere incantation of physical or mental injury is inadequate to survive a motion for summary judgment];see also Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim].

Further, as was previously noted in Section II of this opinion, supra, although it is not required that Plaintiff show he suffered more than a de minimis injury to maintain an excessive force claim; see Wilkins, 130 S.Ct. at 1179-1180 [Noting that the notion that significant injury as a threshold requirement for stating an excessive force claim was rejected in Hudson, 503 U.S. at 7]; the "absence of [a] serious injury" nevertheless remains relevant in an Eighth Amendment inquiry. Wilkins, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to

36



Hudson, 503 U.S. at 9 (quoting Johnson, 481 F.2d at 1033); see also Ellerbe v. Roach, No. 08-3118, 2010 WL 3361703, at * 3 (E.D.N.C. Aug 24, 2010); Brown, 2014 WL 691662, at * 3-5 [Finding that extent of injury is relevant to Eighth Amendment inquiry both because it may suggest whether the use of force plausibly could have been thought necessary in a particular situation, and because it may provide some indication of the amount of force applied]. As noted, Plaintiff has failed to produce any evidence showing a discernible injury in this case. Therefore, while Plaintiff may conceivably have a state law claim arising from this incident, or some further administrative remedy he can pursue, the evidence before this Court is not sufficient to create a genuine issue of fact as to whether constitutionally excessive force was used under the circumstances of this case. See Paul, 424 U.S. at 701 [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care].

Therefore, Plaintiff's excessive force claim asserted as a constitutional violation should be dismissed.

## V.

### (State Law Claims)

In addition to Plaintiff asserting federal claims against the Defendants pursuant to 42 U.S.C. § 1983, all as discussed hereinabove, supra, Plaintiff also alleges that he is asserting each of his Causes of Action against the Defendant SCDC pursuant to state law, and the South Carolina Tort Claims Act (SCTCA) does waive the State of South Carolina's sovereign immunity in state court for



certain tort claims. See S.C. Code Ann. § 15-78-10, et. seq. Further, while the SCTCA specifically reserves South Carolina's Eleventh Amendment immunity from suit in federal court; Id., § 15-78-20(e) ["Nothing in this chapter is construed as a waiver of the state's . . . . immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States . . . ."]; since South Carolina has by virtue of the SCTCA generally consented to suit for tort claims filed against it in state court, the Defendants' voluntary removal of this case to federal court has waived the State's Eleventh Amendment immunity from suit in this Court for those types of claims. Lapides, 535 U.S. at 619 [A state's voluntary appearance in federal court waives sovereign immunity to claims where a state has consented to suit in it own courts for such claims]; Ramos v. Berkeley County, No. 11-3379, 2012 WL 5292899, at * 3, n. 5 (D.S.C. Aug. 7, 2012), adopted by, 2012 WL 5292895 (D.S.C. Oct. 25, 2012).[14]

Notwithstanding their voluntary removal of this case to federal court, however, Defendants assert in their motion for summary judgment that they "have not waived immunity from suit", even while also requesting that this Court exercise supplemental jurisdiction over Plaintiff's state law claims. See Defendants' Brief, pp. 34-37. In any event, even though the undersigned finds that the Defendants have waived their immunity from suit in federal court for Plaintiff's state law claims by virtue of their removal of those claims from state court, for the reasons set forth hereinbelow, this Court should decline to exercise supplemental jurisdiction over those claims.

If the recommendations set forth herein with respect to Plaintiff's federal claims are accepted, the only claims remaining in this lawsuit will be Plaintiff's state law claims being asserted

---

[14]This is in contrast to claims for which the state has not waived immunity from suit in state court, such as claims asserted under § 1983. See discussion, § 1, supra.



against the State pursuant to the South Carolina Tort Claims Act.  However, since Plaintiff has asserted no valid federal claim, this Court should not exercise supplemental jurisdiction over Plaintiff's state law claims.  See Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999) ['"[T]he Constitution does not contemplate the federal judiciary deciding issues of state law among non-diverse litigants"].  Further, when federal claims presented in a case originally filed in state court are dismissed, any remaining state law claims are ordinarily remanded back to state court for resolution under the general doctrine developed in United Mine Workers v. Gibbs, 383 U.S. 715 (1966). See In Re Conklin, 946 F.2d 306, 324 (4th Cir. 1991); Nicol v. Imagematrix, Inc., 767 F.Supp. 744, 746, 749 (E.D.Va. 1991); Mills v. Leath, 709 F.Supp. 671, 675-676 (D.S.C. 1988); Carnegie-Mellon v. Cohill, 484 U.S. 343 (1988); Taylor v. Waters, 81 F.3d 429, 437 (4th Cir. 1996). This doctrine recognizes the state court's role in determining whether summary judgment on state law claims is warranted; Gibbs, 383 U.S. at 726 ["Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well"]; and remand of these remaining state law causes of action will allow the more appropriate court to rule on these exclusively state law issues. Additionally, since these claims have already been briefed, the parties may seek a fast track for resolution of these claims at the state level.  See Rule 40(c) S.C.R.Civ.P.  Even more importantly, if summary judgment were to be denied, it would be much more appropriate for these state law claims to be considered and tried by the state courts.

Therefore, if the Court adopts the recommendations herein for dismissal of Plaintiff's federal claims, his remaining state law causes of action should be remanded back to state court for disposition.  See Clark v. Brown, 861 F.2d 66, 68 (4th Cir. 1988)[Directing dismissal of state law claims on remand following dismissal of Plaintiff's federal § 1983 claim]; Mills, 709 F.Supp. at 675-



676 [Noting that federal courts should generally decline to exercise pendant jurisdiction over remaining state law claims after dismissal of federal claims in a lawsuit]; Carnegie-Mellon, 484 U.S. at 350, n. 7 ["[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state law claims."].

### Conclusion

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted** with respect to Plaintiff's claims asserted § 1983, and that those claims be **dismissed**.  This case should then be remanded back to state court for disposition of Plaintiff's state law causes of action.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

February 27, 2014
Charleston, South Carolina



**Notice of Right to File Objections to Report and Recommendation**


The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).


Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29401

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).

41

